USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: SEP 3 0 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JUANITA KHO,

        Plaintiff,

        v.

NEW YORK AND PRESBYTERIAN
HOSPITAL,

        Defendant.

---

No. 16-CV-5910 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Juanita Kho brings this action alleging discrimination, failure to accommodate, hostile work environment, and retaliation in violation of Title VII, the ADEA, ADA, and Rehabilitation Act, as well as their state and city analogues. Defendant New York and Presbyterian Hospital now moves for summary judgment. For the reasons set forth below, the Hospital's motion is granted.

## FACTUAL BACKGROUND[1]

The following facts, construed in the light most favorable to Kho, are undisputed unless otherwise noted. *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).[2]

---

[1] These facts are drawn from the parties' submissions in connection with the instant motion, including the Rule 56.1 statements submitted by the Hospital ("Def. 56.1") and Kho ("Pl. 56.1") and the Hospital's Counterstatement ("Def. Count. 56.1"). Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied only by way of conclusory statement without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)–(d).

[2] Kho lodges numerous objections to the Hospital's 56.1 statement, on both factual and evidentiary grounds. The vast majority of Kho's objections, however, are fatally flawed and the Court thus disregards them, principally for five reasons. First, in numerous instances she alleges facts contradicting those contained in the Hospital's statement, but fails to provide citations to admissible evidence. Second, certain of Kho's factual assertions contradict her own deposition testimony. *See Palazzo ex rel Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000). Third, she makes other assertions that are supported only by the affidavit she submitted in conjunction with her papers opposing the Hospital's motion and which are similarly contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary

## A.     The Parties and the Staff Nurse Position

Plaintiff Juanita Kho was employed by Defendant New York Presbyterian Hospital as a staff nurse in its Intensive Care Unit ("ICU") from September 2006 until August 18, 2014. Def. 56.1 ¶ 1. Kho was born in the Philippines and is of Chinese ethnicity. Compl. ¶ 47, ECF No. 7. She was fifty-five at the time she commenced her employment. Def. 56.1 ¶ 10.

The Hospital is an acute care hospital that provides inpatient, ambulatory, and preventative care. Def. 56.1 ¶ 2. The ICU provides care for patients in the most critical condition. Def. 56.1 ¶ 5. The Hospital maintains policies, both on its internal network and in its employee handbook, for providing equal employment opportunities. Def. 56.1 ¶ 3. The Hospital's policies provide for reasonable accommodation of employees with disabilities, as well as family and medical leave for an employee's own serious health condition. Def. 56.1 ¶ 4.

John Holmes served as a patient care director in the ICU from June 2006 through April 3, 2017. Def. 56.1 ¶ 7. He was responsible for supervising ICU staff, maintaining patient safety and experience, and managing day-to-day operations. Def. 56.1 ¶ 8. Holmes interviewed Kho when she applied for a position and made the decision to hire her. Def. 56.1 ¶ 9. Holmes had managerial responsibilities over Kho throughout the duration of her employment. Def. 56.1 ¶ 11.

The Hospital maintained a written job description of the staff nurse position listing all of the job duties and responsibilities. Def. 56.1 ¶ 14. Staff nurses function as the primary nurse for

---

judgment."); *Echevvaria v. Diversified Consultants, Inc.*, No. 13-CV-4980 (LAK) (AJP), 2014 WL 929275, at *11 (S.D.N.Y. Feb. 28, 2014). Fourth, many of Kho's evidentiary objections, on hearsay and authentication grounds, are without merit. In particular, many of Kho's hearsay objections are to evidence that is not being offered for its truth. *See Seabrook v. N.Y.C. Health and Hosps. Corp.*, No. 13-CV-4164 (NRB), 2015 WL 273652, at *1 n.2 (S.D.N.Y. Jan. 20, 2015). Finally, Kho disputes the facts underlying many of the complaints against her. But whether or not the underlying complaints are true, they are relevant and admissible to the extent that they are probative of the Hospital's intent in terminating her. *See Howell v. Montefiore Med. Ctr.*, No. 13-CV-8505 (AT), 2016 WL 880373, at *6 (S.D.N.Y. Feb. 16, 2016) ("Although Howell disputes the bases for his multiple disciplinary infractions . . . it is irrelevant unless he provides evidence suggesting that the *actual* bases were discrimination against his protected class." (emphasis in original)). For the sake of efficiency, the Court will not individually address Kho's numerous objections that fail for these aforementioned reasons.

designated patients. Def. 56.1 ¶ 17. They are responsible for assessing, planning appropriate care, evaluating progress, and coordinating care delivery and transitions in care. Def. 56.1 ¶ 18. They also must have effective interpersonal communication skills, adhere to customer service principles, and communicate compassionately. Def. 56.1 ¶ 21. The Hospital maintains a written policy providing for "Handoff Communication." Def. 56.1 ¶ 22.[3] This policy is intended "[t]o standardize handoff communication . . . including the opportunity to ask additional or clarifying questions whenever patient care is transitioned [between nurses]." Def. 56.1 ¶ 24.

## B.    The Hospital Begins Receiving Complaints About Kho

Beginning in 2006, the year she was hired, and continuing until her termination, there were numerous complaints about Kho from patients, families, managers, and co-workers. Def. 56.1 ¶ 25. Holmes made Kho aware of many of the complaints at the time they were received and counseled Kho orally and in writing to improve her performance. Def. 56.1 ¶ 26.[4]

On December 12, 2006, Holmes and another nurse met with Kho to discuss her restraining a patient without first receiving a physician's order, which was contrary to Hospital policy. Def. 56.1 ¶ 28. In January, a patient's family complained about Kho's "roughness." Def. 56.1 ¶ 29. Several months later, on May 2, a nurse complained that Kho was inattentive, abrupt, and harsh during a patient "handoff." Def. 56.1 ¶ 30. As a result, the nurse who assumed responsibility for the patient repeated his respiratory status several times. Def. 56.1 ¶ 30. A mere three days later,

---

[3] Plaintiff disputes that she received a copy of the policy prior to 2014. This evidence is belied by the record, however, which indicates that Kho was instructed to review the "handoff" policy at least by 2007, see Def. 56.1 ¶ 38, but that after receiving a copy she refused to review it, see Pl. Dep. Tr. 84:9–23.

[4] In a blanket assertion, Kho disputes receiving copies of, and being informed about, many of the complaints filed against her during the relevant period. This claim, dubious on its face, is belied by the record. As an initial matter, Kho does concede receiving at least some of the complaints. See Pl. 56.1 ¶ 27. She further acknowledges, moreover, receiving her various performance reviews, corrective action reports, and two work improvement plans, all of which document the substance of many of the complaints. See Pl. 56. 1 ¶¶ 32, 33, 35, 55, 59–60, 68, 71, 73–74, 80, 86, 89–90, 95. As to these various documents, Kho instead objects to the veracity of the allegations contained therein, which, as explained at note 2, supra, the Court need not resolve.

another patient's family also complained that Kho had communicated "roughly" with him. Def. 56.1 ¶ 31.

Later that month, the Hospital issued Kho a report of caution for not communicating effectively during "handoff" and she was instructed to review the Hospital's policy. Def. 56.1 ¶ 32. On June 1, 2007, Kho received a corrective action report for violating the Hospital's Latex Sensitive Patient Care Policy. Def. 56.1 ¶ 33. A few weeks later, a staff nurse submitted a written complaint to Holmes informing him, *inter alia*, that: (1) Kho failed to relay essential information during a "handoff"; (2) inaccurately charted a patient's information; (3) family members of two patients complained about Kho, including that she advised one "you know your mother is dying, right?"; and (4) Kho had demonstrated unsafe care of her patients. Def. 56.1 ¶ 34.

## C. Kho's First Work Improvement Plan and Continuing Complaints

In July 2007, Kho was placed on a Work Improvement Plan ("WIP I"). Def. 56.1 ¶ 35. The WIP I identified the following areas of concern: lack of empathy and service, as well as issues with flexibility and lack of commitment to excellence. Def. 56.1 ¶ 37. Kho was advised, *inter alia*, that she must communicate effectively and with compassion; "update family frequently"; "[a]nswer questions, demonstrating concern of patient and the extraordinary stress the family is experiencing"; "avoid a sharp tone with ancillary staff"; document patient care in a timely manner; "[c]ommunicate handoff in a through [*sic*] and precise manner"; and review the "handoff policy." Def. 56.1 ¶ 38. Holmes advised Kho that she was not performing up to Hospital standards. Def. 56.1 ¶ 39.[5] Kho refused to sign the WIP I. Def. 56.1 ¶ 40. Holmes documented his ongoing counseling during the 90-day work improvement period. Def. 56.1 ¶ 41.

---

[5] Kho claims in her 56.1 Statement that at the 2007 meeting Holmes said she "doesn't know how to speak English." Pl. 56.1 ¶ 39. This assertion, however, is not supported by the evidence cited by Kho, namely her own deposition testimony, in which she claimed not to remember being given a copy of the "handoff" policy in 2007 or having this conversation with Holmes. *See* Kho Dep. Tr. 78–85. Kho's statement in her deposition about being told

Holmes discussed Kho's performance under the WIP I with Human Resources. Def. 56.1 ¶ 42. On August 20, 2007, multiple staff members in the ICU met with the Director of Nursing and raised patient safety concerns related to Kho's care. Def. 56.1 ¶ 43. Charge nurses, responsible for assigning nurses to patients, reported that they did not assign Kho sicker patients out of concern for patient safety. Def. 56.1 ¶ 44. By October 2007, six different nurses had complained that Kho's "handoff" report "was disorganized and incomplete." Def. 56.1 ¶ 45.

On October 10, 2007, several people complained about Kho. The daughter of one patient asserted that Kho refused to provide her with test results because she was too busy. Def. 56.1 ¶ 47. When the daughter approached Kho again, she responded that the daughter had already been told to wait until the next shift. Def. 56.1 ¶ 47. Another patient complained that Kho was uncooperative, stubborn, and argumentative in adjusting bath times and only did so after the patient argued with her. Def. 56.1 ¶ 48. A third patient's family member complained about Kho's "roughness" and requested that Kho not be assigned to the patient. Def. 56.1 ¶ 49.

Two days later, on October 12, Holmes reported to Human Resources that Kho was not satisfying the WIP I, but agreed to extend the period for evidence of improvement. Def. 56.1 ¶ 50. Holmes noted that Kho's "handoff" reports "had been disorganized and required multiple probes from the nurses to obtain the full picture." Def. 56.1 ¶ 51. On October 16, Kho received separate reports of cautions for not exhibiting the values of empathy and respect. Def. 56.1 ¶ 52. On November 7, a member of the hospital's IV team complained that Kho yelled at a patient and was not helpful. Def. 56.1 ¶ 53. In February 2008, Kho was given a performance review for 2007,

---

that she does not know how to speak English instead appears to be a reference to a 2014 conversation. *See* Kho Dep. Tr. 83:3–17. Indeed, Kho elsewhere explicitly acknowledges that Holmes did not make the first comment about her accent until at least 2012, when she "noticed a clear change in how [she] was treated by her manager John Holmes." Kho Aff. ¶ 21, ECF No. 47.

during which she was issued a "needs improvement" rating for her substandard commitment to excellence, including her communications with patients, families, and staff. Def. 56.1 ¶ 55.

On August 26, 2009, a son of a patient complained that Kho ignored his question regarding the amount of insulin she was administering and that he had to ask several times to get a response. Def. 56.1 ¶ 56. Kho also told the patient he could not call his son. Def. 56.1 ¶ 56. The patient asked Kho how many pills she was giving him, to which she responded "[y]ou are like your son, I am not going to explain it to you." Def. 56.1 ¶ 57. The next month, another patient's daughter complained about Kho's rude behavior. Def. 56.1 ¶ 58.

In February 2010, Kho was given her performance review for 2009. Def. 56.1 ¶ 59. Kho was counseled to improve her performance:

> She has had complaints about being abrupt and brusque when communicating with co-workers and customers. She easily becomes overwhelmed by the expectations of multi-tasking in order to take care of a critically ill patient. She cannot be counted upon to act professionally and appropriately in all situations consistently. She continues to isolate herself from unit and co-workers. Any improvements made in any of the above areas is for short periods of time and is not consistent.

Def. 56.1 ¶ 60. Kho was given "needs improvement" ratings in values and behaviors of empathy and respect, as well as multiple specific skills related to clinical excellence, leadership, service excellence, and teamwork. Def. 56.1 ¶ 60. A plan for improvement was instituted requiring Kho to demonstrate effective verbal communication and interpersonal skills among staff, patients and other departments to foster optimal patient care. Def. 56.1 ¶ 61.

Kho did, however, receive an overall rating of "solid." Pl. 56.1 ¶ 60. Specifically, she received reviews of solid in the areas of patient care procedures, patient family education, patient safety, and research/education. Pl. 56.1 ¶ 60. This evaluation was not performed by John Holmes. Pl. 56.1 ¶ 60.

**D. Kho's Leave to Undergo Cancer Treatment**

In 2010, Kho was granted leave from on or about March 18, 2010 to November 22, 2010 to undergo cancer treatment. Def. 56.1 ¶¶ 62–63. The Hospital claims Kho was given the eight months of leave and a temporary part-time light duty job upon her return to work, as she requested, and thereafter returned to her fulltime ICU position. Def. 56.1 ¶ 65. Kho claims, however, that she was required to hire an attorney so that she could be reinstated. Kho Aff. ¶ 20.[6]

In February 2011, Kho was given her performance review for 2010, which noted that "she is encouraged to continue to develop her communications skills with her peers and other members of the healthcare team in stressful and all situations." Def. 56.1 ¶ 67. Kho did, however, receive an overall score of "solid," as well as in every category. Pl. 56.1 ¶ 67. There were no listed areas of improvement. Pl. 56.1 ¶ 67. This review also was not completed by Holmes. Pl. 56.1 ¶ 67.

In February 2012, Kho was given her performance review for 2011 and her continuing communications issues were once again identified as an area in need of improvement: "She is encouraged to continue to develop effective communication skills with her peers and healthcare team in stressful and all situations. She is also encouraged to work on her customer service skills to help patients, families, and peers develop a more positive first impression[] of her." Def. 56.1 ¶ 68. She received a rating of "solid" in every category except for patient safety and leadership. Pl. 56.1 ¶ 68. Leadership was the only category in which she received a "needs improvement" rating. Pl. 56.1 ¶ 68.

On July 27 2012, Holmes received the following complaint from another critical care unit:

---

[6] Other than her own deposition testimony, Kho has produced no evidence in support of this contention. Moreover, this assertion seems to contradict the record, namely a letter provided by the Hospital while she was on leave informing her that her request for an extension of leave was granted, but that if she did not return by a specified date it was *possible* that her employment could be terminated. *See* Ex. 51 (NYPH000277). In any event, crediting Kho's version of events still does not allow her claims to survive summary judgment.

[Kho] is very unsafe and does NOT belong on 4west. She does not appear to possess critical thinking skills and the questions she asked me were honestly frightening. Here are a few examples . . . she had no idea what cardene is or is used for . . . Sat my post catheter patient up at 90 degrees after being told to keep him flat x4 hours . . . . This is an accident waiting to happen. I know you have heard complaints about her before. Please do not allow her back because something bad will happen. It is just a matter of time.

Def. 56.1 ¶ 69. The very next month, another critical care unit requested that Kho not be placed on duty there due to her uncooperative and unsafe conduct. Def. 56.1 ¶ 70. Kho had told an attendant to "bathe a complete care" patient by herself and refused to help, jeopardizing the patient's airway, and then failed to render emergency care. Def. 56.1 ¶ 70.

On September 6, 2012, Holmes counseled Kho on her performance issues. Def. 56.1 ¶ 71. He noted that Kho "failed to take any ownership for the incidents and claimed that they were erroneous perceptions of what she did . . . I also suggested that part of her issue was communication both listening to others and how she communicates with them. I reminded her of some of the issues she has had with communication in the past." Def. 56.1 ¶ 71.

On October 22, 2012, Holmes received the following complaints about Kho: a patient had complained that Kho refused to care for him; a patient's family had complained that Kho was not knowledgeable about the patient's medical condition, did not know how to properly empty internal drains following surgery and administered an IV too quickly; and another patient complained that she had to change her own dressing because it was so soiled, summarizing that "she would've rather stayed in the recovery room if she knew it was going to be like this." Def. 56.1 ¶ 72.

In January 2013, Kho was given her performance review for 2012, which noted that "[s]he has been encouraged throughout the year to attempt to demonstrate effective communication with the MICU team . . . . She is encouraged to continue to improve on her communication and teamwork skills this upcoming year." Def. 56.1 ¶ 73. Kho was given "needs improvement" in

four categories: empathy; patient family education; patient safety; and service excellence. Def. 56.1 ¶ 73. The review emphasized that Kho "continues to have complaints that she does not listen to family members. That she becomes focused on a task and does not listen to staff members and physicians and repeats questions or misses key information." Def. 56.1 ¶ 74. Kho did, however, receive an overall score of "solid." Pl. 56.1 ¶ 73.

In May of that year, a patient complained that Kho did not answer her call bell, that she was in a lot of pain and not medicated in a timely manner, and she was ignored. Def. 56.1 ¶ 76. The same month, a manager complained that Kho's performance was not acceptable as she failed to take a report from the laboratory in a timely manner, did not notify the team right away of an issue involving a patient, and provided incorrect information concerning a patient. Def. 56.1 ¶ 77.

The next month, a patient stated that she would be filing a complaint with the American Medical Association unless Kho was reassigned. Def. 56.1 ¶ 78. The patient was crying as a result of Kho's treatment and advised that she felt "very unsafe" and was "very nervous and scared if Juanita was going to be her nurse for the rest of the night and that she wanted to leave." Def. 56.1 ¶ 78. According to the patient, Kho became angry and frustrated, slamming drawers and throwing an insulin pen. Def. 56.1 ¶ 79. In July, Holmes issued Kho a caution related to the patient complaints from the previous two months. Def. 56.1 ¶ 80.

On November 1, 2013, a patient's wife requested that Kho no longer care for her husband. Def. 56.1 ¶ 81. The same month, a patient complained that Kho had been "mean," telling him that he was calling too much, and that she had other patients. Def. 56.1 ¶ 83. The patient's wife also complained. Def. 56.1 ¶ 84. Another nurse characterized Kho as "rude." Def. 56.1 ¶ 85. Later that month, Kho was issued a corrective action report advising her that "communication with patients, family members and coworkers must improve" and warning that "[f]ailure to demonstrate

immediate and sustained improvement" would result in disciplinary action, possibly termination. Def. 56.1 ¶ 86. Kho refused to sign the report. Def. 56.1 ¶ 87. The very next month, Kho disregarded a physician's end of life instructions by reconnecting a patient's EKG. Def. 56.1 ¶ 88.

In February 2014, Kho was issued her review for 2013. She received an overall rating of "needs improvement," as well as in the following individual categories: empathy; reset – every person counts; primary nursing; planning; coordination of care; health teaching; patient centered care; quality of practice; and resource utilization. Def. 56.1 ¶¶ 89–90. The review noted:

> Juanita Kho fails to maintain the NYP values and behaviors consistently. Communication continues to be her biggest liability. She fails to be an active listener and does not convey empathy or caring. This affects multiple aspect[s] of her job and has been given multiple opportunities to further develop this skill set. [She] does not form [a] therapeutic relationship . . . poor handoffs, poor communication with physician team . . . has had patient and family complaints about a lack of information given even when requested. [C]reates negative first impression with patients, fails to explain things appropriately and does not convey caring . . . documentation is late.

Def. 56.1 ¶ 90.

### E. Kho's Second Work Improvement Plan

On April 25, 2014, Kho was placed on another Work Improvement Plan ("WIP II") and was given a copy. Def. 56.1 ¶ 91. The areas of concern in the WIP II were lack of expression of empathy and concern during communications, failure to timely document patient care and have professional/respectful "handoff," and poor communication within interdisciplinary team/co-workers/Patient Care Director ("PCD"). Def. 56.1 ¶ 94.

Among the action plan items were the following: improve active listening skills including paraphrasing and repeating back ideas or requests; anticipate patient and families need for information and provide the educational handouts along with verbal information about

medications, lab results, disease process, and procedures; and respond to questions immediately and, if unable to do so, inform patient and family when you will respond. Def. 56.1 ¶ 96. During her shift, Kho was required to "outline on paper the information you will need to provide during "handoff" to help it stay efficient and organized." Def. 56.1 ¶ 96. Kho was also advised to focus on charting throughout the shift and complete shift assessment charting by midnight so she could be prepared for the "handoff." Def. 56.1 ¶ 97. She was similarly informed to be accountable for her actions, and not respond with defense or denials when asked to correct behaviors. Def. 56.1 ¶ 97. Kho refused to sign the WIP II and denied that she had any performance issues. Def. 56.1 ¶ 98. From April through July 2014, Kho failed to accomplish all of the WIP II behaviors and action plan items. Def. 56.1 ¶ 100. Holmes met with Kho on multiple occasions to review the WIP II and documented his ongoing counseling to improve her performance. Def. 56.1 ¶ 101.

Holmes consulted Human Resources and Rosenthal concerning Kho's failure to satisfy the elements of the WIP II. Def. 56.1 ¶ 102. On May 2, 2014, Kho advised Holmes that there was nothing from the WIP II that she had tried. Def. 56.1 ¶ 103. On May 30, when Holmes asked Kho about whether she had changed her approach to "handoffs," she denied that any change was needed. Def. 56.1 ¶ 104. Holmes advised Kho that the "handoff" he had observed was "disorganized." Def. 56.1 ¶ 105.

On June 17, 2014, Holmes spoke to Kho about timely charting, and she again denied that there were any issues. Def. 56.1 ¶ 106. Holmes reminded Kho that the WIP II required her to complete patient charting early in her shift, Def. 56.1 ¶ 106, though his notes from July 1 indicate that Kho's "charting was completed in a timely manner from the last few shifts," Ex. 43 at 4 (NYPH000321). On July 1, Kho admitted to Holmes that she was not providing patients with the educational handouts, and claimed not to know even where to locate them. Def. 56.1 ¶ 107. That

same day, Kho asked for a copy of the WIP II, and for the third time, Holmes provided her with one. Def. 56.1 ¶ 108. When asked for written outlines of the "handoffs," Kho advised that she was not reducing the information to paper as instructed. Def. 56.1 ¶ 109. Kho similarly denied that there were issues with her "handoffs," and Holmes reminded her that she was required to outline them in writing. Def. 56.1 ¶ 110. On July 18, 2017, Holmes observed a "handoff" during which Kho failed to comply with these requirements. Def. 56.1 ¶ 111. Kho also did not timely chart the admission history of a new patient, nor did she provide a newly admitted patient with educational materials. Def. 56.1 ¶¶ 113–14.

### F.    Kho Contacts Human Resources and is Ultimately Terminated

Kho first approached Human Resources in June or July 2014, two to three months after she was placed on the WIP II. Def. 56.1 ¶ 115. Kho complained about being placed on the WIP II and the instruction that she distribute educational materials explaining treatment to patients and their families. Def. 56.1 ¶ 116.[7] In subsequent meetings with human resources, Kho opined that her English was leading to her communication issues, and also suggested that maybe her 2010 cancer treatment, age, or ethnicity were why she had been placed on the WIP II. Def. 56.1 ¶ 117.

Kho was advised that that she needed to improve her poor work performance as required by the WIP II. Def. 56.1 ¶ 120. Kho reported that she suffered a back injury on July 3 and 17, 2014 while on the job, but returned to work following her vacation to perform her regular duties thereafter, and made no request for an accommodation. Def. 56.1 ¶ 121. On August 18, 2014, Kho's employment was terminated. Def. 56.1 ¶ 123.

---

[7] Kho disputes this statement, but the evidence to which she cites relates to the subsequent meetings with Ms. Dawkins, an employee in Human Resources, not the initial one. Dawkins Dep. 31:14–32:9; 33:10–15; 34:2-5; 36:22–24. To the extent Kho's affidavit in support of her opposition papers contradicts the record, the Court declines to credit it. *See* Kho Aff. ¶ 34. Moreover, the record is clear that Kho did not reference being discriminated against or harassed in her first meeting with Ms. Dawkins. *See* Dawkins Dep. Tr. 29:9–11 (Q: Did she mention discrimination or harassment at that first meeting? A: No.").

## PROCEDURAL HISTORY

Kho received her notice of right to sue from the EEOC on April 28, 2016 and subsequently filed a Complaint commencing this action. ECF No. 7. The Hospital filed its Answer on October 7, 2016. ECF No. 13. After the parties engaged in mediation and completed discovery, the Hospital filed the instant motion. ECF No 32.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod*, 653 F.3d at 164 (citation omitted).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation and alteration omitted).

**DISCUSSION**

## I.    Discrimination

The Hospital is entitled to summary judgment on Kho's discrimination claims. Claims of discrimination brought under Title VII, the ADEA, ADA, and Rehabilitation Act are analyzed pursuant to the burden-shifting framework described in *McDonnell-Douglas*. *See Pagan v. CSC*, No. 17-CV-1271 (KBF), 2018 WL 3242268, at *4–5 (S.D.N.Y. July 3, 2018) (the Rehabilitation Act), *Caesar v. Riverbay Corp.*, No. 15-CV-8911 (NRB), 2017 WL 6887597, at *4 (S.D.N.Y. Dec. 27, 2017) (Title VII, ADEA, ADA). To survive a motion for summary judgment, "a plaintiff must first establish a *prima facie* case of discrimination by showing that: [i] she is a member of a protected class; [ii] she is qualified for her position; [iii] she suffered an adverse employment action; and [iv] the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citation omitted).

If a plaintiff establishes a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors" and the "burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment." *Id.* (citations omitted). If the employer proffers a legitimate reason, "the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination." *Id.* (citation omitted). "[T]he plaintiff must [then] put forth adequate evidence to support a rational finding that the . . . reasons proffered by the employer were false, and that more likely than not the employee's [protected characteristic] was the real reason for the discharge." *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 249 (S.D.N.Y. 2015).

Kho asserts claims of discrimination based on her following characteristics: race, national origin, age, and disability. Even assuming, *arguendo*, that Kho has made out a *prima facie* case,

14

the Hospital is entitled to summary judgment with respect to each claim.[9] The Hospital has

proffered a legitimate, non-discriminatory reason for Kho's termination, namely her poor

performance, including violations of various of the Hospital's policies, as documented by the

numerous complaints made against her during the course of her employment—by co-workers and

patients alike—and the resulting disciplinary measures, including two instances on which she was

placed on work improvement plans. Indeed, the evidence of her substandard performance is

overwhelming. Holmes started receiving complaints about Kho a mere three months after she

began her employment, and she was placed on her first work improvement plan before she had

even been at the Hospital a full year. The complaints continued throughout her nearly eight-year

tenure. This is a sufficient showing for the Hospital to meet its burden at the second step of the

*McDonnell-Douglas* framework. *See Borzon v. Green*, No. 16-CV-7385 (VEC), 2018 WL

3212419, at *10–11 (S.D.N.Y. June 29, 2018), *appeal filed* (July 27, 2018); *Howell*, 2016 WL

880373, at *6.[10]

The dispositive question thus becomes whether Kho has produced sufficient evidence

tending to show that the Hospital's explanation for her termination was pre-textual. She has not.

Kho appears to make four arguments on this point, only three of which are substantive:

(1) the Court may not consider the Hospital's legitimate explanations for her firing because they

---

[9] Concerning the adverse action prong, the focus is on Kho's termination. She has never alleged that any of the occasions on which she was reprimanded constitute an adverse employment action. It is doubtful that such events could qualify. *See Kpaka v. City Univ. of N.Y.*, No. 14-CV-6021 (RA), 2016 WL 4154891, at *7 (S.D.N.Y. Aug. 2, 2016). To the extent Kho relies on her purported difficulty in being re-instated following her leave to undergo cancer treatment in 2010 as the adverse employment action underlying her discrimination, failure to accommodate, or retaliation claims, it is time-barred because that sequence of events did not occur within 300 days of Kho submitting her EEOC claim. *See* 42 U.S.C. § 200e-5(e). The Court does note, however, two ways in which time-barred acts may remain relevant. First, to the extent Kho alleges a continuing violation—such as a hostile work environment—she need only show that part of the violation took place within the limitations period. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004). Second, time-barred events may also be considered as "background evidence in support of a timely [discrimination] claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

[10] It is immaterial that Kho might subjectively disagree with the Hospital's view of her performance. *See Borzon*, 2019 WL 321419, at *10–11.

are based on inadmissible hearsay and unauthenticated documents; (2) Holmes made disparaging comments about her accent; (3) Kho noticed a disproportionate number of older nurses leaving the Hospital, who allegedly told her that they felt as if they were being forced out, *see* Kho Aff. ¶ 31, and (4) she was more severely punished than other nurses who committed similar mistakes but were not of Chinese ethnicity.[11] The Court has already rejected the first argument in its recitation of the facts. *See* note 2, *supra*. The remaining arguments are similarly unpersuasive.

Holmes' comments about Kho's accent are insufficient to demonstrate that the Hospital's stated reasons for terminating her were pre-textual. Kho complains that beginning in 2012, Holmes began criticizing her accent, saying that she "need[s] to speak English" and "no one can understand [her] Chinese accent." *See* Kho Aff. ¶ 21.[12] Although comments about an individual's accent may be actionable, Kho has failed to carry her burden, as these comments do not establish that Holmes harbored any discriminatory animus, either based on her accent or people with a similar accent or who are of the same race or national origin. *See Grant v. Cont'l Cas. Co.*, No. 13-CV-5675 (AT), 2015 WL 1499724, at *8 (Mar. 30, 2015) (plaintiff failed third step of *McDonnell-Douglas*, where supervisor "often said 'I don't understand you, you're not being clear,'" because remarks were "devoid of direct or even oblique reference to race or national origin"); *Kwan v. Andalex Grp., LLC*, 10-CV-1389, 2012 WL 1862768, at *7 (S.D.N.Y. May 22, 2012) (comments that plaintiff's accent "was weird and referred to her alienage . . . [in]sufficient to raise a triable issue as to pretext"), *rev'd on other grounds*, 737 F.3d 834 (2d Cir. 2013); *Manko*

---

[11] Kho has not addressed whether the Hospital's explanation was pre-textual, as her briefing ceased at the second step of the *McDonnell-Douglas* framework. These arguments were thus made in the context of Kho advancing her *prima facie* case. A plaintiff may, however, rely on her evidence of a *prima facie* showing in satisfying her burden at the third step. *Hardekopf v. Sid Wainer & Son*, No. 02-CV-3251 (LAP), 2004 WL 2199502, at *7 (S.D.N.Y. Sept. 29, 2004).

[12] Kho also claims, for the first time in her papers opposing summary judgment, that Holmes yelled at her. The Court disregards this new allegation. *See Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 555 (S.D.N.Y. 2009), *aff'd*, 358 F. App'x 229 (2d Cir. 2009).

*v. Deutsche Bank*, 554 F. Supp. 2d 467, 472, 478 n.36 (S.D.N.Y. 2008) (granting defendant summary judgment even though supervisor "mocked her accent by mimicking her pronunciation of various words and phrases" because "there [was] no record evidence that her accent was the basis for an adverse employment action"); *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, 00-CV-2574 (JSM), 2002 WL 826877, at *10 (S.D.N.Y. Apr. 30, 2002) ("That [the supervisor] said that she could not understand [plaintiff's] accent does not support a claim of discrimination."), *aff'd*, 56 F. App'x 12 (2d Cir.2003) (summary order); *Bellom v. Neiman Marcus Grp., Inc.*, 975 F. Supp. 527, 531–32 (S.D.N.Y. 1997) (summary judgment appropriate despite supervisor's "alleged mimicking of [plaintiff's] accent on one or two occasions").

Kho's position is especially meritless in light of the fact that Holmes made these comments in the context of performance reviews and her language skills were reasonably related to her job performance. These considerations further weigh against finding that the comments evince discriminatory animus. *See Costantin v. N.Y.C. Fire Dep't*, No. 06-CV-4631 (GBD) (THK), 2009 WL 3053851, at *20 (S.D.N.Y. Sept. 22, 2009) ("[W]here language materially interferes with job performance, it may provide a legitimate basis for an adverse employment action."); *Altman v. N.Y.C. Dep't of Educ.*, No. 06-CV-6319 (HB), 2007 WL 1290599, at *4–5 (S.D.N.Y. May 1, 2007) ("There is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." (citation omitted)).

As for the purported age discrimination in violation of the ADEA, Kho's only proffered evidence is an unsupported allegation that older nurses felt that they were being forced out. Such vague, conclusory, and unsubstantiated allegations, however, are unavailing. *See Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 17 (2d Cir. Jan. 30, 2018) (summary order) ("Saji's sole evidence . . . are her own conclusory statements and mere allegations . . . which are not enough to defeat a

motion for summary judgment." (alterations omitted)). This same reasoning applies to Kho's blanket assertion that other nurses who were not Chinese were disciplined less severely for similar transgressions. *See id.*

The Court similarly discerns no basis for Kho's disability claim. She appears to rely solely on the timing of her July 2014 back injury in relation to her August termination. Particularly in light of the extensive disciplinary history against Kho, however, such a showing is insufficient for her to carry her burden at the third step of the *McDonnell-Douglas* framework. *See Clark*, 96 F. Supp. 3d at 256–57 ("[W]hile temporal proximity of the comments and the adverse action alone may still be sufficient at the prima facie stage, it is not sufficient at the pretext stage." (citation omitted)); *Hardekopf*, 2004 WL 2199502, at *7.[13]

Further undercutting Kho's claims is that her disability aside, she was a member of each of the other protected classes—national origin, race, and age—when she was hired.[14] *See Spiegler v. Israel Disc. Bank of N.Y.*, No. 01-CV-6364 (WK), 2003 WL 21488040, at *10 (S.D.N.Y. June 25, 2003); *O'Connor v. Viacom Inc./Viacom Int'l Inc.*, No. 93-CV-2399 (LMM), 1996 WL 194299, at *7 (S.D.N.Y. Apr. 23, 1996). Moreover, the decisions to hire and fire Kho were made by the same person, Holmes. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."); *Curry v. Fed. Express Corp.*, No. 14-CV-7844 (AT), 2016 WL 10749141, at *8 (S.D.N.Y. Mar. 16, 2016).

---

[13] The Court is cognizant that Kho claims to have been forced to hire a lawyer in 2010 in order to be re-instated following her leave to undergo cancer treatment. Whatever merit this argument may have, however, it does not serve as useful background evidence in support of her claim for disability discrimination for the aforementioned reasons, particularly because nearly four years elapsed between those events and her termination.
[14] Kho was fifty-five when hired, within the scope of protection afforded by the ADEA. *See Smith*, 2018 WL 3392872, at *3.

Indeed, there is a dearth of evidence evincing any semblance of discriminatory intent on behalf of Holmes or anyone else employed by the Hospital. It is perhaps most telling what Kho has not produced. For instance, other than conclusory statements, she has not alleged that a single similarly situated employee who did not belong to one of her protected classes was treated differently. *See Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) ("[D]isparate treatment . . . is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." (citation omitted)); *Toussaint v. N.Y. Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 212–13 (S.D.N.Y. 2017). Nor has Kho alleged that she was replaced by an employee who was not a member of one of her protected classes. *See Estepa v. Shad*, 652 F. Supp. 567, 570 n.5 (E.D.N.Y. 1987) ([U]nless a Title VII plaintiff is replaced by a member of a non[-]protected class, proof of intentional discrimination appears extremely difficult, if not practically impossible.").

Lastly, the Court's conclusion is buttressed by two other considerations. First, complaints about Kho began within several months of her hiring, continuing relatively unabated for seven years until she was fired. This further cuts against the notion that the Hospital's explanation for terminating her was pre-textual. *Cf. Goonewardena v. N.Y. Workers Comp. Bd.*, 258 F. Supp. 3d 326, 345 (S.D.N.Y. 2017) (in retaliation context, employer's consistent, long-held view of employee's subpar performance undermined the notion that he was terminated in retaliation for engaging in protected conduct), *appeal filed* (July 18, 2017). Second, during Kho's time at the Hospital through her first meeting with Human Resources, she never once referenced the possibility that she was the victim of discrimination. *See Osborne v. Literacy Partners, Inc.*, No. 04-CV-6652 (DAB), 2007 WL 2298354, at *6 (S.D.N.Y. Aug. 9, 2007) (plaintiff's failure to utilize internal complaint procedures undermined her discrimination claims). These facts further counsel

against finding that the Hospital's stated rationale for terminating Kho was mere pretext. On this record, the Hospital is entitled to summary judgment on all of Kho's discrimination claims.

## II.     Failure to Accommodate

Kho asserts a claim for failure to accommodate her disability, which is similarly dismissed. To make out a *prima facie* case of failure to accommodate, a plaintiff must establish that (1) she has a disability; (2) the defendant had notice of the disability; (3) she could perform the essential functions of the job with reasonable accommodation; and (4) the defendant refused to make such accommodations. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006). Such claims are also assessed pursuant to *McDonnell-Douglas. Clark*, 96 F. Supp. 3d at 249.

Here, unlike Kho's discrimination claims, she fails to make out even a *prima facie* case. Indeed, the uncontroverted evidence is that Kho never requested an accommodation for her back injury. *See* Kho Dep. Tr. 168:12–169:4, 277:22–278:25, 321:1–6. It is well-settled that an employer cannot be liable for failing to provide an accommodation that was never requested. *See Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 18–19 (2d Cir. Dec. 18, 2015) (summary order) ([A]n employer cannot refuse to make an accommodation that it was never asked to make[.]" (citations and alterations omitted)). Accordingly, the Hospital is entitled to summary judgment on Kho's failure-to-accommodate claim.[15]

## III.    Hostile Work Environment

Kho also asserts hostile work environment claims based on race and national origin. To establish a hostile work environment, Kho "must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v.*

---

[15] As previously noted, Kho's purported difficulty in returning to work following her cancer-treatment is time-barred from serving as the basis for this claim. *See* 42 U.S.C. § 200e-5(e).

*City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (citation omitted). This standard has objective and subjective components: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (citation omitted). "[T]he plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).

The Hospital is entitled to summary judgment on Kho's hostile work environment claims. These claims appear predicated on: (1) Holmes' comments regarding Kho's accent and (2) occasions on which Holmes allegedly yelled at Kho. As described at note 11, *supra*, the Court declines to consider the second set of events in resolving this motion.

As for the comments Holmes allegedly made with respect to Kho's accent, they fail to raise a triable issue of fact, principally for four reasons: (1) the comments were not sufficiently pervasive or severe; (2) they were reasonably related to Kho's ability to adequately perform her job responsibilities; (3) the comments do not evince any discriminatory animus on behalf of Holmes; and (4) they were not made in a manner intended to humiliate or embarrass her.

No reasonable juror could find that Holmes' comments were "continuous and concerted" or constituted a "steady barrage of opprobrious . . . comments."[16] *Tolbert*, 790 F.3d at 439; *accord Yan v. Ziba Mode Inc.*, No. 15-CV-47 (RJS), 2016 WL 1276456, at *1, 6 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss where co-workers "commented on [plaintiff's] foreign accent and inability to communicate with" customers (citation omitted)); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 679–80 (S.D.N.Y. 2011) (granting motion to dismiss because despite "mocking [of plaintiff's] accent and pronunciation . . . [he] has not alleged that such conduct was either pervasive or

---

[16] Kho has never provided an estimate of how often Holmes purportedly made these comments about her accent. The most precise description the Court has identified is that he made the comments "on a number of occasions." Kho Aff. ¶ 21.

continuous"); *Lessambo v. PricewaterhouseCoopers, L.P.*, No. 08-CV-6272, 2010 WL 3958787, at

*11 (S.D.N.Y. Sept. 27, 2010) (supervisor's "three offensive remarks" about national origin did not

create a hostile work environment), *aff'd*, 451 F. App'x. 57 (2d Cir. 2011) (summary order); *cf.*

*Costantin*, 2009 WL 3053851, at *20-21 (denying defendant summary judgment where supervisor

"asked [plaintiff] if she could speak and write in English, threw reports at her, commanded her to

read them aloud [in front of colleagues], and forced her to repeat words that emphasized her accent

for the purpose of allowing her colleagues to laugh at her pronunciation").

This is especially true in light of the context in which these comments were made. As

discussed at length with respect to Kho's discrimination claims, the comments were made by the

very supervisor who hired her in the context of performance reviews and were reasonably related

to her performance. Particularly bearing this in mind, the comments do not evince discriminatory

animus on behalf of Holmes.

Finally, it is significant that these comments were not made in the presence of Kho's co-

workers or in any other manner intended to humiliate her. *Cf. Duarte v. St. Barnabas Hosp.* 265 F.

Supp. 3d 325, 349–50 (S.D.N.Y. 2017) (denying defendants summary judgment where, *inter alia*,

supervisor would repeat words said by plaintiff and "everybody would laugh" and publicly corrected

plaintiff's misspellings in notes); *Costantin*, 2009 WL 3053851, at *21 (denying defendants summary

judgment because "[t]he embarrassment of constantly having her accent mocked . . . can be

expected to corrode the respect and trust of [p]laintiff's colleagues sufficiently to unreasonably

interfere with her job performance"). Based on the totality of the circumstances, therefore, no

reasonable jury could conclude that these comments created a hostile work environment.

## IV.     Retaliation

The Hospital is also entitled to summary judgment on Kho's Title VII retaliation claims

predicated on race and national origin. Such claims are similarly evaluated under the *McDonnell*

*Douglas* burden-shifting standard. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). The only difference is that at the third step a plaintiff must demonstrate that "retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845–46 (2d Cir. 2013) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)).

Even assuming, *arguendo*, that Kho has made a *prima facie* showing, the Hospital is entitled to summary judgment. As discussed with respect to Kho's discrimination claims, the Hospital has proffered a legitimate, non-discriminatory explanation for her termination. Here, too, Kho has failed to show that the Hospital's explanation was mere pretext. The only protected activity on which Kho's retaliation claims could be based is her complaint during meetings with Human Resources that her placement on the WIP II might have been due to race or national origin. Any such contention, however, is unpersuasive. In addition to all of the reasons discussed at length with regard to her discrimination claims, Kho has failed to show that the purpose of her termination was anything other than her poor work performance. In arguing that the Hospital retaliated against her for opposing conduct that she reasonably believed to constitute discrimination, Kho appears to rely entirely on the timing of her complaint in relation to her termination, which is wholly insufficient to establish that her protected conduct was a "but-for" cause of her termination. *See Simpson v. N.Y. State Dep't of Civil Servs.*, 166 F. App'x 499, 502 (2d Cir. 2006) (summary order) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to

satisfy appellant's burden to bring forward some evidence of pretext."); *Kirkland v. Cablevision Sys.*, No. 09-CV-10235 (LAP) (KNF), 2013 WL 4026246, at *3 (S.D.N.Y. July 22, 2013).[17]

## V.     State Law Claims

Kho also brings causes of action under the New York State and City Human Rights Laws. The Court declines to exercise supplemental jurisdiction over these remaining claims.

Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may "decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). As a general rule, "if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." *Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010) (citation omitted). Accordingly, the Court declines to exercise supplemental jurisdiction over Kho's remaining claims.

## CONCLUSION

For the foregoing reasons, the Hospital's motion is granted. The Clerk of Court is respectfully directed to enter judgment in favor of Defendant, terminate the motion pending at docket entry thirty-two, and close the case.

SO ORDERED.

Dated:     September 30, 2018
           New York, New York

                                        Ronnie Abrams
                                        United States District Judge

---

[17] For substantially similar reasons as discussed previously, to the extent Kho engaged in protected activity when she allegedly retained a lawyer in order to be re-instated following her cancer treatment, that conduct does not aid this claim, particularly in light of the four years that elapsed between those events and her termination.